# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| ST. ANTHONY REGIONAL HOSPITAL,<br><br>    Plaintiff,<br><br>vs.<br><br>ERIC D. HARGAN,[1]<br>Acting Secretary of the Department of Health and Human Services,<br><br>    Defendant. | No. 16-CV-3117-LTS<br><br>**REPORT AND RECOMMENDATION** |

This appeal involves a dispute between Plaintiff St. Anthony Regional Hospital (the Hospital) and Defendant Secretary of the Department of Health and Human Services (the Secretary) regarding the proper method of calculating the volume decrease adjustment (VDA) payment owed to the Hospital through the Medicare program. The Hospital argues that the Secretary's methodology resulted in it not being fully compensated for its fixed costs, as required by statute, and that the Secretary should not have classified certain expenses (related to laundry, food, drugs, and certain supplies) as variable costs. I recommend **affirming** the Secretary's decision.

## I. BACKGROUND

Hospitals that treat patients with health insurance through the Medicare program are paid a predetermined fixed amount per patient based on that patient's diagnosis, irrespective of the actual cost of treatment to the hospital. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 406 n.3 (1993). This payment is called the Diagnosis Related

---

[1] Secretary Hargan is substituted for his predecessor in accordance with Federal Rule of Civil Procedure 25(d).

Group (DRG)[2] payment. Congress adopted the DRG payment method in 1983 to encourage hospitals to provide services at lower costs; prior to that, hospitals were reimbursed for their actual costs and had "little incentive . . . to keep costs down," as "[t]he more they spent, the more they were reimbursed." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999) (alteration in original) (quoting *Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 974 (D.C. Cir. 1991)). Under the DRG method of payment, "[h]ospitals that treat patients for less than the DRG amount get 'rewarded,' while hospitals that spend more than the DRG amount must absorb the excess costs." *Cmty. Hosp. of Chandler, Inc. v. Sullivan*, 963 F.2d 1206, 1207 (9th Cir. 1992).

To provide some protection to rural hospitals, Congress also provided that sole community hospitals that experience a more than 5% decline in patients due to circumstances beyond their control are entitled to an additional payment, called the VDA payment, "as may be necessary to fully compensate the hospital for the fixed costs it incurs in . . . providing inpatient hospital services, including the reasonable cost of maintaining necessary core staff and services." 42 U.S.C. § 1395ww(d)(5)(D)(ii). In this appeal, the parties agree that the Hospital is entitled to a VDA payment for the 2009 fiscal year. They dispute only the amount of such payment.

The regulations promulgated by the Secretary in effect during the relevant time period did not provide a specific formula for calculating the VDA payment. *See* 42 C.F.R. § 412.92(e)(3) (2009). Instead, the regulation directed that the following factors be considered in determining the VDA payment amount: "(A) [t]he individual hospital's needs and circumstances, including the reasonable cost of maintaining necessary core staff and services in view of minimum staffing requirements imposed by State agencies; (B) [t]he hospital's fixed (and semi-fixed) costs . . . ; and (C) [t]he length of time the hospital has experienced a decrease in utilization." *Id*. § 412.92(e)(3)(1). In addition,

---

[2] The DRG payment is part of the inpatient prospective payment system (IPPS) and is sometimes called an IPPS payment.

the regulation provided that the VDA payment could not exceed the difference between the hospital's total Medicare costs and the hospital's DRG payment. *Id.* § 412.92(e)(3).

A section of the Medicare Provider Reimbursement Manual (Manual or PRM), issued around the same time as the regulation, also addressed calculation of the VDA payment:

> [A VDA] payment is made to an eligible [hospital] for the fixed costs it incurs in the period in providing inpatient hospital services including the reasonable cost of maintaining necessary core staff and services, not to exceed the difference between the hospital's Medicare inpatient operating cost and the hospital's total DRG revenue.
>
> Fixed costs are those costs over which management has no control. Most truly fixed costs, such as rent, interest, and depreciation, are capital-related costs and are paid on a reasonable cost basis, regardless of volume. Variable costs, on the other hand, are those costs for items and services that vary directly with utilization such as food and laundry costs.
>
> In a hospital setting, however, many costs are neither perfectly fixed nor perfectly variable, but are semifixed. Semifixed costs are those costs for items and services that are essential for the hospital to maintain operation but also vary somewhat with volume. For purposes of [the VDA payment], many semifixed costs, such as personnel-related costs, may be considered as fixed on a case-by-case basis.
>
> In evaluating semifixed costs, [the Secretary] consider[s] the length of time the hospital has experienced a decrease in utilization. For a short period of time, most semifixed costs are considered fixed. As the period of decreased utilization continues, [the Secretary] expect[s] that a cost-effective hospital would take action to reduce unnecessary expenses. Therefore, if a hospital did not take such action, some of the semifixed costs may not be included in determining the amount of the [VDA] payment . . . .

PRM 15-1 § 2810.1(B).[3] The Manual also included two examples that illustrated that unless a hospital's Medicare costs exceeded a cap based on its Medicare costs for the

---

[3] Although it was intended that the relevant section of the Manual would be updated, it never was, and the Secretary reaffirmed the use of the VDA-payment methodology set forth in the Manual in 2006 when it updated the methodology used to calculate whether a hospital could have reduced its staff. *See Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems*, 71 Fed. Reg. 47870, 48056 (Aug. 18, 2006) ("The process for determining the amount

previous year (the cap is not in play here), the hospital's VDA payment would be calculated as "the entire difference between" the hospital's Medicare costs and its DRG payment. *Id.* § 2810.1(D). The example in the Manual does not explicitly say that the Medicare costs should include only fixed and semifixed costs, but in another example related to evaluating core staffing, the Manual states that if a hospital's staff exceeded the number allowed, Medicare costs in the formula should be "reduced to eliminate the salary costs" of the excess staff. *Id.* § 2810.1(C).

The amount of the VDA payment is initially determined by a hospital's Medicare administrative contractor (MAC),[4] usually a private insurance company that contracts with the government to process hospitals' Medicare claims. The MAC's determination can be appealed to the Provider Reimbursement Review Board (Board). An administrator for the Centers for Medicare and Medicaid Services (CMS), which administer the Medicare program through authority delegated by the Secretary, may then review any decision of the Board.

Here, the Hospital's total Medicare costs were $8,348,116, and its DRG payment was $6,273,905. AR 14, 32, 34.[5] The MAC, the Board, and the CMS Administrator all classified the following expenses as variable: (1) purchased laundry services, (2) dietary cost of food, (3) central distribution supplies, (4) drugs and intravenous (IV) solutions, (5) operating room supplies, and (6) implantable devices. AR 12, 30-31. Based on this classification, the Hospital's variable Medicare costs were $1,543,034 and its fixed Medicare costs were $6,805,082. AR 14.

The MAC and the CMS Administrator both determined that the Hospital's VDA payment should be its total Medicare costs, less its variable Medicare costs and its DRG

---

of the [VDA payment] can be found in section 2810.1 of the . . . Manual. . . . The [VDA payment] amount is determined by subtracting the second year's DRG payment from . . . [t]he second year's costs minus any adjustment for excess staff . . . .").

[4] MACs are also known as "fiscal intermediaries."

[5] "AR" refers to the administrative record below (filed at Docs. 8 to 8-2).

4

payment (or stated another way, the Hospital's fixed Medicare costs less its DRG payment). AR 7, 14. Thus, the CMS Administrator found that the Hospital's VDA payment should be $531,177 ($8,348,116-$1,543,034-$6,273,905) (the MAC would have come to the same conclusion but for some mathematical errors). AR 14.

The Board employed a different methodology. Rather than subtracting the entire DRG payment from the Hospital's fixed Medicare costs (as the MAC and CMS Administrator did), the Board found that only that portion of the DRG payment intended to compensate the Hospital's fixed costs should be subtracted. AR 33-34. The Board estimated the portion of the DRG payment related to fixed costs by determining what percentage of the Hospital's Medicare costs were fixed costs and multiplying that percentage by the total DRG payment ((fixed Medicare costs ÷ total Medicare costs) x DRG payment). *Id.* Thus, the Board estimated that the Hospital's DRG payment related to fixed costs was $5,114,261 (($6,805,084[6] ÷$8,348,116) x $6,273,905). *Id.* The Board determined the VDA payment by subtracting the fixed-costs DRG payment from the Hospital's fixed Medicare costs ($6,805,084-$5,114,261) for a total of $1,690,823.[7] *Id.*

The CMS Administrator rejected the Board's methodology, finding that the Board's "creation of a 'fixed[-costs] portion' of the DRG payment is unsupported by the

---

[6] The Board determined the Hospital's fixed costs were $2 more than the CMS Administrator. AR 34.

[7] A visual illustration: the MAC and CMS Administrator used the following formula to determine the VDA payment:

$$\text{Total Med. Costs} - \text{Variable Med. Costs} - \text{Total DRG Payment}$$

The Board, on the other hand, employed this formula:

$$\text{Total Med. Costs} - \text{Variable Med. Costs} - \text{Total DRG Payment} \times \frac{\text{Fixed Med. Costs}}{\text{Total Med. Costs}}$$

(Because fixed Medicare costs are estimated based on the ratio of fixed costs to total costs (*see* AR 573), the DRG payment can be multiplied by either the ratio of fixed Medicare costs to total Medicare costs or the ratio of fixed costs to total costs; the ratios are equivalent.)

statute, regulations, [M]anual, and prior case law." AR 13. The CMS Administrator noted that the statute mandates only that the hospital receive, through a combination of its DRG payment and its VDA payment, an amount "at least equal to" its fixed costs. *Id.* The CMS Administrator found that the Board's methodology assumes that a portion of the hospital's variable Medicare costs are also compensated. *Id.*

The CMS Administrator's decision is the final decision of the Secretary. The Hospital appealed to this court, arguing that the CMS Administrator's methodology for calculating VDA payment violates the plain language of the statute and that the Board's methodology should be employed instead. The Hospital also argues that the CMS Administrator (as well as the Board and the MAC) erred in classifying any expenses as variable. The parties briefed the issues,[8] and the Honorable Leonard T. Strand, Chief Judge of the United States District Court for the Northern District of Iowa, referred this case to me for a report and recommendation.

## II. STANDARD OF REVIEW

The Secretary's decision (the decision of the CMS Administrator) is the result of formal adjudication, and judicial review is governed by the standard set forth in the Administrative Procedure Act (APA). *See* 42 U.S.C. § 1395oo(f)(1) (Medicare Act incorporates APA); *see also St. Mary's Hosp. of Rochester v. Leavitt*, 416 F.3d 906, 909-10, 914 (8th Cir. 2005) (decisions of the Board and CMS Administrator involve formal adjudication entitled to *Chevron* deference). Under the APA, a reviewing court may set aside an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E).

The Secretary's construction of its regulations and the statute it administers is entitled to substantial deference. *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87,

---

[8] Although the Hospital originally requested oral argument, it withdrew that request by email.

94-95, 97-100 (1995) (discussing deference owed to CMS Administrator's decision made through formal adjudication when that decision was in accord with a provision in the Manual); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997) (deference to agency's construction of a regulation); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (deference to agency's construction of a statute). "A reviewing court should not reject reasonable administrative interpretation even if another interpretation may also be reasonable." *Shalala v. St. Paul-Ramsey Med. Ctr.*, 50 F.3d 522, 528 (8th Cir. 1995) (quoting *Creighton Omaha Reg'l Health Care Corp. v. Bowen*, 822 F.2d 785, 789 (8th Cir. 1987)). "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 510-12 (1994) (quoting *Pauley v. Beth Energy Mines, Inc.*, 501 U.S. 680, 687 (1991)) (discussing review of a decision by the CMS Administrator). The court should reject an agency interpretation, however, that is plainly erroneous or that contradicts the plain meaning of the statute, the plain meaning of the regulation, or "other indications of the [drafter's] intent at the time of . . . promulgation." *St. Paul-Ramsey*, 50 F.3d at 527-28 (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512); *see also Chevron*, 467 U.S. at 843 n.9.

### III.    METHODOLOGY FOR CALCULATING VDA PAYMENT

The Hospital argues that the Secretary's methodology for calculating the VDA payment is arbitrary and capricious because it violates the plain language of the statute and is inconsistent with the example set forth in the Manual. From my review, no federal court has ruled on this issue.

The statute provides that the VDA payment serves to "adjust[]" the DRG payment "as may be necessary to fully compensate the hospital for [its] fixed [Medicare] costs . . . , including the reasonable cost of maintaining necessary core staff and services." 42

U.S.C. § 1395ww(d)(5)(D)(ii). The Secretary calculated the VDA payment as the difference between the Hospital's fixed Medicare costs and its DRG payment. Thus, the Secretary's position is that the Hospital was fully compensated for its fixed Medicare costs by the DRG payment and VDA payment in combination, the amount of which totaled the Hospital's fixed Medicare costs. The Hospital argues that because the DRG payment compensates it for both fixed and variable Medicare costs, only that portion of the DRG payment related to fixed costs should be subtracted from its fixed Medicare costs to determine the amount of the VDA payment. The Hospital argues that under the plain language of the statute, it is entitled to payment for a portion of its fixed and variable Medicare costs as usual (by the DRG payment), plus an adjustment (the VDA payment) to compensate it for its total fixed Medicare costs. The Secretary rejected the methodology advocated by the Hospital (and employed by the Board) precisely because it would compensate the Hospital for the totality of its fixed Medicare costs, plus some of its variable Medicare costs, which the Secretary does not believe is required by the statute. AR 13.

The Secretary's interpretation does not violate the plain language of the statute. The statute requires that a hospital be "fully compensate[d]" for its fixed Medicare costs through a combination of the VDA payment and the DRG payment (indeed, the Hospital recognizes that the VDA payment need not equal its fixed Medicare costs and that whether its fixed costs have been fully compensated is based on both the VDA and DRG payments). Here, the Hospital received payment (through both the DRG and VDA payments) totaling its fixed Medicare costs. That is all that the plain language of the statute requires. The statute is ambiguous whether a hospital must also receive its usual share of reimbursement (through the DRG payment) for its variable costs. Although the Secretary could have reasonably interpreted the statute to require the usual partial payment for variable Medicare costs in addition to payment for the totality of a hospital's

8

fixed Medicare costs, as advocated by the Hospital, the Secretary's interpretation is also reasonable. It is therefore entitled to deference.[9]

The Hospital relies heavily on the Secretary's adoption of new regulations that apply prospectively to cost-reporting periods beginning on October 1, 2017. 42 C.F.R. § 412.92(e)(3). The new regulations adopt the methodology employed by the Board here. *Id*. When the Secretary adopted the new regulations, the Secretary stated:

> We continue to believe that our current approach in calculating [VDA payments] is reasonable and consistent with the statute. The relevant statutory provisions . . . are silent about and thus delegate to the Secretary the responsibility of determining . . . what level of adjustment to [DRG] payments may be necessary to ensure that total Medicare payments have fully compensated [a hospital] for its "fixed costs." These provisions suggest that the [VDA payment] amount should be reduced (or eliminated as the case may be) to the extent that some or all of [a hospital's] fixed costs have already been compensated through other Medicare . . . payments. . . . Nevertheless, we understand why hospitals might take the view that CMS should make an effort, in some way, to ascertain whether a portion of [DRG] payments can be allocated or attributed to fixed costs in order to fulfill the statutory mandate to "fully compensate" a qualifying [hospital] for its fixed costs. Accordingly, after considering these views, . . . we proposed to prospectively change how the MACs calculate the [VDA payment] and require that the MACs compare estimated Medicare revenue for fixed costs to the hospital's fixed costs to remove any conceivable

---

[9] The Hospital's (and the Board's) interpretation seems more in line with the purpose of the VDA payment set forth in the Manual. The Manual suggests that the VDA payment is meant to reimburse a hospital during a slow year for its fixed costs, which it has no control over, but not for unnecessary variable costs that "vary directly with utilization" and that a hospital could "take action . . . to reduce." PRM 15-1 § 2810.1(B). The DRG payment, on the other hand, compensates the hospital for costs it incurs treating patients, which necessarily include variable costs it incurs, such as for a patient's food and laundry. Thus, a hospital could not "take action . . . to reduce" the variable costs covered by the DRG payment, because those costs are being incurred due to utilization—for example, a hospital treating patients who have to be fed and whose sheets have to be laundered. Nevertheless, it is unclear from the statute (and the regulation) whether these variable costs should be compensated, regardless of whether the hospital can do anything to avoid them. The Secretary's interpretation of the statute is reasonable and thus owed deference, and I may not reject it merely because I find a "competing interpretation[] [would] best serve[] the regulatory purpose." *Thomas Jefferson Univ.*, 512 U.S. at 512.

possibility that a hospital that qualifies for the [VDA payment] could ever be less than fully compensated for fixed costs as a result of the application of the adjustment.

*Medicare Program; Hospital Inpatient Prospective Payment System and Policy Changes*, 82 Fed. Reg. 37990, 38180 (Aug. 14, 2017). The Hospital argues that the Secretary acknowledged through this statement that the methodology employed by the CMS Administrator here violated the plain meaning of the statute.

Although the Secretary acknowledged the possibility that a hospital may not be fully reimbursed for its fixed costs under the old methodology, that possibility involved the fixed-costs cap based on the previous year's costs, which is not at issue here. *See id.* at 38181 ("[U]nder the current methodology, but not under our proposed methodology, it is possible that a hospital would still receive no [VDA] payment even if its Medicare fixed costs exceeded its total [DRG payment] if those fixed costs exceeded the previous year's costs updated for inflation."). In cases where, like here, a hospital's fixed Medicare costs were less than the previous year's fixed Medicare costs adjusted for inflation, the Secretary's employed methodology ensured that all of a hospital's fixed costs would be covered by the DRG and VDA payments in combination. That the Hospital's fixed Medicare costs may not have been fully reimbursed if subject to the cap has no bearing on the reasonableness of the Secretary's action here: the Hospital was not subject to the cap and its fixed Medicare costs were fully reimbursed.

Merely because the Secretary changed his interpretation of the statute does not prove that the previous interpretation was unreasonable.

> [T]hat an agency interpretation contradicts a prior agency position is not fatal. Sudden and unexplained change or change that does not take account of legitimate reliance on prior interpretation may be arbitrary, capricious or an abuse of discretion. But if these pitfalls are avoided, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.

*Baptist Health v. Thompson*, 458 F.3d 768, 777 (8th Cir. 2006) (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996)). Here, both the old and new

10

methodologies are reasonable interpretations of an ambiguous statute. Contrary to the argument of the Hospital, the Secretary consistently applied the methodology used here to determine the amount of the VDA payment (changing its methodology only after a new regulation, adopted through notice-and-comment rulemaking, went into effect). The Hospital cites no final agency decision to support its argument that the Secretary applied inconsistent methodologies, relying instead on a statement in the preamble to the proposed new regulations in the Federal Register: "[I]n . . . adjudications, the [Board] and the CMS Administrator have recognized that . . . [a hospital's VDA payment] should be reduced to reflect the compensation of *fixed costs* that has already been made through []DRG payments." *Medicare Program; Hospital Inpatient Prospective Payment System and Proposed Policy Changes*, 82 Fed. Reg. 19796, 19933 (Apr. 28, 2017) (emphasis added). Contrary to the Hospital's argument otherwise (Doc. 20 at 9), this statement is not inconsistent with the methodology employed here: as explained above, the Secretary considered the entire DRG payment as compensating a hospital's fixed costs (because the statute does not require that a hospital be compensated for any of its variable costs, even if the DRG payment ordinarily compensates a hospital for some of those costs). This conclusion is bolstered by the final agency decisions cited by the Secretary in support of its statement in the preamble, all of which employ the methodology used here. *See Greenwood Cnty. Hosp. v. Blue Cross Blue Shield Ass'n*, Dec. No. 2006-D43, Case No. 04-0025, 2006 WL 3050893, at *6 (P.R.R.B. Aug. 29, 2006) (determining VDA payment as the difference between the hospital's fixed and semifixed costs and its DRG payment); *Lakes Regional Healthcare Spirit Lake v. Blue Cross Blue Shield Ass'n*, Dec. No. 2014-D16, 2014 WL 5450078, at *6 (H.C.F.A. Sept. 4, 2014) (same); *Unity HealthCare v. Blue Cross Blue Shield Ass'n*, Dec. No. 2014-D15, 2014 WL 5450066, at *5 (H.C.F.A. Sept. 4, 2014) (same), *appeal pending*, *Unity HealthCare v. Burwell*, No. 14-CV-121-HCA (S.D. Ia.); *Fairbanks Mem'l Hosp. v. Wis. Physician Servs.*, Dec. No. 2015-D11, 2015 WL 5852432, at *4-5 (H.C.F.A. Aug. 5, 2015) (same; rejecting Board methodology of fixed Medicare costs less a ratio of the DRG payment related to fixed

costs); *see also Trinity Reg'l Med. Ctr. v. Wis. Physician Servs.*, Dec. No. 2017-D1, 2017 WL 2403399, at *7-9 (H.C.F.A. Feb. 9, 2017) (rejecting methodology employed by the Board here and affirming that "VDA is equal to the difference between . . . fixed and semi-fixed costs and . . . DRG payment"). Since at least 2006, the Secretary's final decisions have consistently employed the methodology used here. The Secretary's decision was not arbitrary and capricious, despite the agency's prospective policy change to employ the methodology advocated by the Board and the Hospital.

The Hospital also argues that the methodology employed by the Board is inconsistent with the example set forth in the Manual. As an initial matter, the Manual contains interpretative rules adopted without notice and comment, and it is intended to provide guidance without binding the Secretary. *See St. Paul-Ramsey*, 50 F.3d at 527 n.4. As such, "'[a]n action based on a violation of [the Manual] does not state a legal claim' because interpretative rules are not mandatory and 'never can be violated.'" *Id.* (first alteration in original) (quoting *Drake v. Honeywell, Inc.*, 797 F.2d 603, 607 (8th Cir. 1986)); *see also Saint Marys Hosp. of Rochester v. Leavitt*, 535 F.3d 802, 808 (8th Cir. 2008) ("[T]he [Manual], while a useful guide to interpreting the Medicare statute and regulations, is not strictly binding on the Secretary." (quoting *Baptist Health,* 458 F.3d at 778 n.9)).[10]

In any event, it is not clear whether the methodology employed by the Secretary here is inconsistent with the Manual. The Hospital is correct that when read in isolation, examples in the Manual support that the VDA payment should be calculated as a hospital's total Medicare costs (including variable costs) less a hospital's DRG payment: the examples explain that when a hospital's "Program Inpatient Operating Cost [is] less

---

[10] Language in the Manual itself also supports that the examples relied on by the Hospital here are not meant to bind the Secretary: the Manual includes a note after the examples, stating that "[i]f [a MAC] determines that the procedures in this section, when applied to a specific adjustment request, generate an anomalous result, the [MAC] may request a review by [the Board and CMS Administrator]." PRM 15-1 § 2810.1(D).

than" the cap, "its [VDA payment amount] is the entire difference between [its] Program Inpatient Operating Cost and [its] DRG payments." PRM 15-1 § 2810.1(D), Example A (illustrating VDA payment not subject to the cap); *see also* PRM 15-1 § 2810.1(D), Example B (illustrating VDA payment affected by the cap). The Manual explains that the VDA payment is calculated under the assumption that the hospital "budgeted based on prior year utilization and . . . had insufficient time in the year in which the volume decrease occurred to make significant reductions in cost." PRM 15-1 § 2810.1(D). Thus, the VDA payment "allows an increase in cost up to the prior year's total Program Inpatient Operating Cost . . . increased" for inflation." PRM 15-1 § 2810.1(D).

On the other hand, the Manual makes clear that a VDA payment should compensate a hospital for its fixed and semifixed costs, but not its variable costs. PRM 15-1 § 2810.1(B). And the Manual recognizes that a MAC should "evaluat[e] semifixed costs" to determine whether a hospital could have "take[n] action to reduce unnecessary expenses"; if so, the Manual instructs that "some of the semifixed costs may not be included in determining the amount of the [VDA] payment." *Id.* This provision seems at odds with the example's use of total Medicare costs (as opposed to fixed and semifixed costs) in determining the VDA amount. The Board explained in a 2006 decision:

> [T]he text [of the Manual] explicitly dictates that fixed (and semi-fixed) costs may comprise the [VDA payment], [but] the use of the term "operating costs" in the subsequent examples may suggest that variable costs could be included. However, the Board finds that the examples are intended to demonstrate how to calculate the [VDA payment cap] as opposed to determining which costs should be included in the [VDA payment].

*Greenwood Cnty Hosp.*, 2006 WL 3050893, at *6 n.19 (citations omitted). That "Program Inpatient Operating Cost" in the example does not include a hospital's variable costs is further supported by another example in the Manual, which involves calculating whether a hospital had excess staff that could have been reduced:

> Hospital B's nursing staff[] . . . exceeds the core staff [allowed] . . . .
> Hospital B is eligible for a [VDA] payment . . . , but its cost . . . must first

13

> be reduced to eliminate the salary costs of the . . . excess of core staff. Once the excess salary costs are eliminated, the cost report is re-run, generating a new Program Inpatient Operating Cost that is the basis for the [VDA] payment . . . .

PRM 15-1 § 2810.1(C)(6)(a), Example B. Thus, "Program Inpatient Operating Cost" does not necessarily mean a hospital's total Medicare costs, but rather, the costs a hospital is eligible to have reimbursed (which does not include variable costs). The Secretary could reasonably read the Manual as supporting its methodology of the difference between a hospital's fixed and semifixed costs (a hospital's eligible costs) and a hospital's DRG payment. And as discussed above, the Secretary has consistently employed the methodology used here and is not bound by the Manual. Thus, any inconsistency with the Manual is irrelevant. The methodology employed by the Secretary was reasonable, and the Secretary's resulting decision was not arbitrary and capricious nor inconsistent with the law.

## IV. *VARIABLE COSTS*

The Hospital argues that even if the Secretary's methodology was permissible, the Secretary's exclusion of certain costs as variable was arbitrary and capricious and not supported by substantial evidence. The Secretary determined that the Hospital's costs related to purchased laundry services, food, central distribution supplies, drugs, IV solutions, operating room supplies, and implantable devices were variable and thus, not compensable. The Hospital argued below that none of its costs should be classified as variable because it reduced its costs as much as possible, and "[t]he only costs incurred by [the Hospital] for . . . supplies and services were directly related to the care provided to its actual patients," so all its costs were necessary for the hospital to maintain operation. AR 77, 256. The Hospital essentially makes that same argument on appeal, although the Hospital clarifies that not all its costs were used in connection with treating patients (as suggested below), arguing instead that certain minimum levels of food and supplies must be maintained in case of emergency and thus, cannot be reduced.

14

Neither the statute nor the regulation defines fixed costs. The Hospital relies on the definitions of fixed and semifixed costs that appear in the Manual: fixed costs are defined as costs "over which management has no control," and semifixed costs are defined as costs "for items and services that are essential for the hospital to maintain operation but also vary somewhat with volume." PRM 15-1 § 2810.1(B). The Hospital argues that the costs classified as variable are actually semifixed costs because they were essential for the hospital to maintain operation.

The Hospital's argument misses the mark. The Hospital ignores the definition of variable costs that appears in the Manual: "those costs for items and services that vary directly with utilization[,] such as food and laundry costs." *Id.* Thus, the Manual explicitly recognizes that food and laundry costs—two categories of expenses at issue here—are variable costs.

The Hospital argues that whether an expense is classified is variable must be determined on a case-by-case basis. Although the decision to compensate semifixed costs is determined on a case-by-case basis, *id.*, the same cannot be said for variable costs. The regulation provides that when determining the VDA payment amount, the MAC should consider an "individual's hospital's needs and circumstances, including the reasonable cost of maintaining necessary core staff and services in view of minimum staffing requirements imposed by state agencies"; a hospital's "fixed (and semi-fixed) costs"; and "[t]he length of time the hospital has experienced a decrease in utilization." 42 C.F.R. § 412.92(e)(3)(i). At the time of the regulation's adoption, further explanation appeared in the Federal Register:

> Fixed costs are defined as those over which management has no control. Many truly fixed costs, for example, rent, interest, and depreciation, are capital-related costs and are paid on a reasonable cost basis, regardless of patient volume. Variable costs, on the other hand, are those costs for items and services that vary directly with utilization. However, in a hospital setting, many costs are neither perfectly fixed nor perfectly variable, but are semifixed. Semifixed costs are those costs for items and services that are essential for the hospital to maintain operation but which will also vary

15

> with volume. For purposes of this adjustment, many semifixed costs, such as personnel-related costs, may be considered as fixed costs on a case-by-case basis. *An adjustment will not be made for truly variable costs, such as food and laundry services*.

Medicare Program, Fiscal Year 1990; Mid-Year Changes to the Inpatient Hospital Prospective Payment System, 55 Fed. Reg. 15150, 15156 (Apr. 20, 1990) (emphasis added). Neither the statute nor the regulation prevents the Secretary from categorically excluding certain costs as variable, and guidance issued at the time of the regulation's adoption (as well as the Manual) supports the Secretary's decision to categorically exclude certain costs as variable. That the Hospital could not reduce its expenses any further is insufficient to transform its variable costs into semifixed costs. *Cf. Trinity Regional*, 2017 WL 2403399, at *7 ("[E]ven assuming *arguendo* such [variable] costs could be considered semi-fixed or fixed, the [hospital] failed to provide convincing evidence (e.g., contracts) demonstrating that any portion of these costs was fixed or semi-fixed."). The Secretary's decision was supported by substantial evidence.

The Secretary has routinely classified the types of costs at issue here as variable. *See id*. at *7 (affirming MAC's exclusion of costs related to "billable medical supplies, billable drugs, . . . [and] dietary and laundry as variable" because "the types of cost associated with all of [these] categories . . . would generally be expected to be inherently correlated to some degree with patient volume"); *Fairbanks Mem'l Hospital*, 2015 WL 5852432, at *3 (affirming MAC's exclusion of costs related to medical supplies, pharmaceuticals, food, dietary formula, and linen and bedding as variable as "they either vary directly with utilization or are within the [hospital's] control"); *Lakes Regional Healthcare*, 2014 WL 5450078, at *2 (affirming MAC's exclusion of "billable medical supplies, billable drugs, [and] IV drugs[] . . . as variable costs"); *Unity Healthcare*, 2014 WL 5450066, at *5 (affirming MAC's exclusion of "billable medical supplies, billable drugs and IV solutions, . . . and dietary and linen expenses as variable"). The Secretary's decision to categorically exclude certain costs as variable was not arbitrary and capricious.

## V. CONCLUSION

The court recommends that the district court affirm the Secretary's decision and enter judgment in favor of the Secretary.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**ENTERED** this 29th day of December, 2017

Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa